

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

*Sandra Wilkinson*
*Chief, Major Crimes*
*Sandra.Wilkinson@usdoj.gov*

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4921
MAIN: 410-209-4800
FAX: 410-962-0716

*September 18, 2014*

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

OCT 07 2014

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

Christopher Davis, Esq.
Davis & Davis
1350 Connecticut Ave., NW, Suite 202
Washington, DC 20036

Re:  United States v. Anthony Preston, Criminal No. GLR 13-0229

Dear Mr. Davis:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by **September 22, 2014,** it will be deemed withdrawn. The terms of the agreement are as follows:

### Offense of Conviction

1)  The Defendant agrees to plead guilty pursuant to Fed. R. Crim. P.11(c)(1)(C) to Counts One and Eighteen of the Superseding Indictment pending against him, which charges him with conspiracy to conduct and participate in the activities of a racketeering enterprise, in violation of 18 U.S.C. §1962(d)), and use and carry of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §924(c) The Defendant admits that he is, in fact, guilty of these offenses and will so advise the Court.

### Elements of the Offense

2)  The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

On or about the dates charged in the Superseding Indictment:

1

a) . Count One - Racketeering Conspiracy (18 U.S.C. § 1962(d)): From no later than 2008, through or about May 8, 2013, the defendant agreed to participate (1) in an enterprise (2) that was engaged in or affected interstate commerce and (3) that engaged in a pattern of racketeering activity.

b) Count Eighteen – Possession of a Firearm During and in Relation to a Crime of Violence (18 U.S.C. §924(c)): From no later than 2008, through or about May 8, 2013, in the District of Maryland, the defendant (1) knowingly (2) used and carried during and in relation to, and possessed in furtherance of a crime of violence (racketeering enterprise) (3) a firearm.

## Penalties

3) The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: For Count One: twenty years imprisonment, a fine of $250,000 and a period of supervised release of three (3) years, and for Count Eighteen: life imprisonment, a mandatory minimum term of imprisonment of five (5) years, a fine of $250,000 and a period of supervised release of five (5) years. In addition, the Defendant must pay $200 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664. If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4) The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a) If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b) If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

        c)      If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

        d)      The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

        e)      If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

        f)      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

        g)      If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

        h)      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

5)      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will

impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

6) This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

a) For **Count One**, the base offense level for a violation of 18 U.S.C. §1962(d) is driven by the greater of nineteen or the offense levels applicable to the underlying racketeering activity. U.S.S.G. § 2E1.1(a)(2); Application Note 1.

b) The racketeering activity here includes aggravated assaults and drug trafficking.

c) Group 1: March 18, 2012 Aggravated Assault. The base offense level is 14. U.S.S.G. §2A2.2(a). A dangerous weapon (a baseball bat) was brandished or its use was threatened, increasing the guideline level by 3 levels. U.S.S.G. § 2A2.2(b)(2). There is an additional 3 level increase because the victim sustained bodily injury, and a 2 level increase because the assault was motivated by a payment or money or offer of money other thing of value. U.S.S.G. § 2A2.2(b)(3) and (4). Thus, the resulting offense level is **22. (Group 1)**

d) Group 2: April 20, 2013 Aggravated Assault. The base offense level for the aggravated assault on April 20, 2013 is 14. U.S.S.G. §2A2.2(a). A dangerous weapon (mace and a knife) was used, increasing the guideline level by 4 levels. U.S.S.G. §2A2.2(b)(2). A victim sustained bodily injury, increasing the guideline by an additional 3 levels. U.S.S.G. § 2A2.2(b)(3). Thus, the resulting offense level is **21. (Group 2)**

e) Group 3: Drug Trafficking. The base offense level is 26. U.S.S.G. § 2D1.1. In anticipation of forthcoming changes to the Drug Quantity Table in the United States Sentencing Guidelines §2D1.1, the United States hereby agrees not to oppose a two-level downward variance. In exchange, the defendant agrees not to seek a sentence reduction under 18 U.S.C. §3582(c)(2) if the proposed changes become effective. There is a 2 level increase because the defendant attempted to obstruct or impede the administration of justice with respect to the investigation or prosecution of the instant offense of conviction. U.S.S.G. § 3C1.1 Thus, the resulting offense level is **26 (Group 3)**

f) Grouping. **Group 3** has the highest offense level **(26)**. The resulting offense level is adjusted by 3 levels, making the offense level **29.** U.S.S.G. §3D1.4.

g) The defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive (U.S.S.G. § 3B1.1(a)), increasing the guideline level by 4 levels. **Thus the final adjusted offense level is 33.**

4

h)    This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office may oppose any adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

i)    After acceptance of responsibility, but before application of the Career Offender Guidelines, the defendant's adjusted offense level is 31, Criminal History Category III, guideline range 135 – 168 months plus the five year mandatory minimum sentence for Count Eighteen.

7)    However, based on the pre-plea presentence report, the parties agree that the Defendant is a career offender. Accordingly, the applicable offense level is 37, Criminal History Category VI. U.S.S.G. § 4B1.1(c)(3). Thus, the guideline range for Count One, with 2 levels off for acceptance of responsibility, is 292-365 months.

8)    There is a mandatory minimum term of imprisonment of 5 years for Count Eighteen to be imposed consecutive to any sentence imposed for Count One.

9)    This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics or sentencing guidelines factors set forth in the United States Sentencing Guidelines will be raised or are in dispute.

**Obligations of the United States Attorney's Office**

10)   The parties stipulate and agree that, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), a sentence of 240 months imprisonment in the custody of the Bureau of Prisons is the appropriate disposition of this case. This agreement does not affect the Court's discretion to impose any lawful fine or to set any lawful term and conditions of supervised release. In the event that the Court rejects this plea agreement, either party may elect to declare the agreement null and void. Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea agreement pursuant to the provisions of Federal Rule of Criminal Procedure 11(d)(2)(A).

**Waiver of Appeal**

11)   In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a)    The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

5

b) The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

c) Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d) The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

12) The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, (iii) moves to withdraw his guilty plea or (iv) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

13) The Defendant expressly understands that the Court is not a party to this agreement. The Defendant understands that the Court is under no obligation to accept this plea offer made pursuant to Rule 11(c)(1)(C). The Defendant understands that neither the prosecutor, nor his counsel, or the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Forfeiture

14) The defendant agrees to forfeit all right, title and interest in the property seized by law enforcement authorities from his residence on May 8, 2013, including an H&R revolver, .22 caliber, with one live round of ammunition, brass knuckles, various prescription pills, marijuana, $1,222 in U.S. currency, and various cellular telephones. He further agrees to take whatever steps are necessary to pass clear title to those properties to the United States.

### Entire Agreement

15) This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: /s/ _____
Rachel M. Yasser
Sandra Wilkinson
Assistant United States Attorney

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

9-30-14
Date

_____
Anthony Preston

I am Mr. Preston's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

9-30-14
Date

_____
Christopher Davis, Esq.

7

## Attachment A
## Statement of Facts

*The undersigned parties hereby stipulate and agree that the following facts are true and accurate, and that if this matter had gone to trial, the government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter gone to trial.*

Anthony Preston, a/k/a "40," or "Tone," ("PRESTON") born in 1986, age 27, was a resident of Laurel, in Howard County Maryland. PRESTON has prior convictions for armed robbery and attempted armed robbery, and, as a result, was a person prohibited from possessing a firearm.

### BLOODS AFFILIATION

PRESTON has been a member of the Bloods gang since at least 2007, and he associates with the following Blood gang members operating out of Howard County, Maryland: Giovanni Wright, a/k/a "G," Michael Johnson, a/k/a "Ace;" Rouchelle Chesson, a/k/a "Black," Faisal Mapangala, a/k/a "Pistol," Van Carroll, a/k/a "Kool-Aid," and others. PRESTON is a leader of the "Swann" set, a sub-group of the Bloods, along with Wright, Johnson, and others. Preston achieved the rank of "O.Y.G" or "O.G.," ("Original Young Gangster" or "Original Gangster"), terms used for a leader in the gang with authority over other Bloods members.

PRESTON was identified as a member of the Bloods as the result of a long term investigation conducted by the Bureau of Alcohol, Tobacco, Firearms, and Explosive s (ATF), and the Howard County Police Department (HCPD). The investigation included four court ordered wiretaps on gang members' cellular telephones, to include co-defendants Wright and Gladden, a gang leader with rank over Preston.

The investigation began with an armed robbery of an ATF Confidential Informant (CI) in Columbia, Maryland on November 8, 2011. On Thursday, November 3, 2011, co-defendant Johnson provided two photos of firearms-- a rifle and a handgun-- available for purchase by the CI. Johnson's hand, with a noticeable Bloods tattoo is depicted in one of the photographs where Johnson is holding the rifle. The CI had scheduled a meeting (observed and recorded by law enforcement) with Johnson to purchase the firearms. Instead, Johnson directed other gang members to rob the CI. Johnson was later arrested and pled guilty to the assault and robbery of the CI, as well as racketeering conspiracy, and use and possession of firearms in furtherance of the conspiracy. The HCPD executed a search warrant on a cellular telephone seized from Johnson at the time of his arrest. Phone contacts stored on Johnson's cell phone included a phone number for PRESTON under the contact "Big Homie," a term used for a leader in the gang. Call record details revealed that Johnson had phone contacts with PRESTON and other gang members, to include Wright and Mapangala, on November 8, 2011, the day of the assault and robbery of the ATF CI. The phone also contains an image of PRESTON holding the same rifle pictured in the texts sent to the ATF CI. PRESTON learned of the federal investigation in 2012, and drove a witness to Grand Jury with the purpose of impeding the investigation.

1

The Bloods is a national criminal street gang and a racketeering "enterprise," that is, a group of individuals associated in fact that engage in, and the activities of which affect, interstate and foreign commerce, and an ongoing organization whose members function as a continuing unit for the common purpose of achieving the objectives of the enterprise. Members of the Bloods frequently engage in criminal activity, including, but not limited to, aggravated assaults, assaults, drug trafficking, robberies, burglaries, obstruction of justice, and threatening and intimidation of witnesses. Bloods are required to commit acts of violence to maintain membership and discipline within the gang and against rival gangs. Participation in criminal activity by a member, particularly violent acts directed at rival gangs or as directed by the gang leadership, increase the respect accorded to that member, result in that member's maintaining or increasing his position in the gang, and could result in a promotion to a leadership position. The Bloods often generate income through drug trafficking and commit other criminal activities to further the gang and the reputation of the gang.

The Bloods are made up of various sub-groups known as "Sets" between which some differences can and do exists. Bloods Sets operate independently of each other, and are currently located in almost every state in the United States. Several sets or cliques relevant to Howard County have been identified to include: the "Swanns," "400 Tree Topp," "Tree Top Piru," and "Cut Throat Committee" (CTC). Bloods members in Howard County may belong to different "Sets," or sub groups, and ultimately report to leadership based in the surrounding cities, but belong to one criminal enterprise, and operate as such. Bloods from different "Sets" residing in Howard County form an alliance to further the mission of the Bloods gang.

PRESTON was captured on the wiretap discussing the inter-affiliation of the gang sets in Howard County, and his leadership role:

> Like, I got, I got four (4) Piru (*a well-known Bloods set*) out there, I have two (2) hunters (*a well-known Bloods set: Bounty Hunter*) out there, I have two (2) Swanns out there, and uh, I think one (1) [U/I] Mafia (*another Bloods set*) nigga.

## GANG ASSOCIATION

Among his gang activities, PRESTON attended meetings, supported fellow incarcerated gang members, participated in discussion regarding gang sanctions, and planned and executed retaliation against others who he felt undermined his authority within the gang.

One gang meeting that PRESTON attended was at WRIGHT's house. Also in attendance were co-defendants Canty, Carroll, Bieryla, Wright, and Chesson. The gang discussed a possible sanction against Bloods member Bieryla. Wright was intercepted discussing gang business, and the possible sanction against Bieryla, on wire intercepts of Wright's telephone.

PRESTON also maintained communications with incarcerated Bloods members in his "set." For example, on August 19, 2012, Johnson called co-defendant Carter from CDF and she placed a three-way call to PRESTON. Johnson reported that he (Johnson) did 45 days in the

2

"hole" because the correctional staff recovered a cell phone that they believed belonged to him. PRESTON told Johnson that "one of the homies just got bodied," common slang used to describe when someone is murdered.

Among his criminal activities as a gang member, PRESTON planned, participated and approved of acts of violence, and was a leader in drug trafficking to and with fellow gang members. PRESTON, and his Bloods associates, regularly carried firearms in connection with and in furtherance of their unlawful acts.

## ARMED ROBBERIES and ACTS OF VIOLENCE

On October 2, 2010, an individual identified herein by the initials "PM" reported to the HCPD that he had been robbed of money and drugs by Michael Johnson. At the time of the robbery, PM was the "middle man" helping his friend sell drugs. PM received text messages from a person who, at the time, he believed was his friend arranging a meeting place for the transaction. PM stated that Johnson approached him and demanded the drugs. PM stated that an unidentified black male missing his front teeth "reinforced" Johnson and told PM to "just give him [Johnson] the marijuana." PM stated that the unidentified male had his hand under his shirt as if he was holding a gun. The Government would prove at trial that PRESTON was previously shot in the mouth during an attempted robbery and was missing his front teeth. Johnson was holding a knife and robbed PM of his cash and 20 grams of marijuana. PM stated that Johnson and the unidentified black male drove away in what he described as a champagne-colored Cadillac. Another witness identified the vehicle as PRESTON's car. Phone records reflect that Johnson was in regular contact by texting with numbers associated with PRESTON before the robbery and as Johnson was planning the robbery and texting the victim.

Less than two weeks after the robbery, HCPD conducted a traffic stop involving PRESTON. PRESTON was driving his beige/gold Lincoln and Johnson was the front seat passenger. Also present was co-defendants Faisal Mapangala and Kyle Austin.

In addition, wiretap intercepts over PRESTON and Wright's lines revealed that the two men were in communication with co-defendant Gladden regarding potential gang violence in February 2013. On February 21, 2013, PRESTON was asked by Wright to contact co-defendant Gladden to determine the status of a potential Bloods member who was causing problems with members or associates of PRESTON'S set. According to Wright, this individual was claiming to be Blood, so Wright turned to PRESTON to inquire if this individual was in fact a member of the Bloods gang. Both Wright and PRESTON agreed that taking violent action against an individual could cause problems if he was "family," a reference to being a member of the Bloods. PRESTON then contacted Gladden, who agreed to check on the status of this potential Bloods member. Toll records indicate that Gladden then called a Bloods member in Baltimore City. Following this inquiry, Gladden contacted PRESTON and stated that that he checked with one of the "Big Homies," who had the "line-up" before Gladden, and was unable to verify that the individual was a member of the Bloods. Gladden stated that since this "Big Homie" was not able to verify his status as a Blood, "he just told me to tell your people go ahead and do what they do then." PRESTON then called Wright back and gave him the green light. Shortly thereafter,

Wright was surveilled driving around and captured on the wiretap discussing the fact that he was looking for the potential victim while armed with a firearm.

On April 12, 2013, PRESTON directed Wright to participate in an assault. On that date, there were a number of calls between PRESTON and co-defendant Mapangala regarding an altercation involving a man who, according to a witness, was described by PRESTON as "a fake Blood." PRESTON told Mapangala that he did not "Give a fuck if that's your man or not homie. Like flat out…if I see you with [him] I'm doing him I'm letting you know this now. This nigga don't know how to keep my fucking name out of his mouth…I swear to God on Swann nigga," a reference to the Swann set of the Bloods. After these calls, PRESTON called Wright and instructed him to "grab his flag" (a reference to his gang flag, or bandana). Wright asked if he needed to "grab anything else?" a reference to a firearm. PRESTON then travelled to Wright's house, picked him up, and the two men travelled together to the prospective victim's house in Columbia, Maryland. Law enforcement was not able to observe the interaction but the victim and a witness later described it by stating that Wright approached the house with a red bandana tied around his face, and was stopped by a witness with a weapon from proceeding further. PRESTON, who had a red bandana tied around his neck, told the intended victim that he would talk to him when the witness "wasn't around," and stated words to the effect that "this ain't a game."

On April 20, 2013, PRESTON was captured on video assaulting a former gang member with a knife and mace in a 7-Eleven convenience store. PRESTON also hit the girlfriend of the gang member in her face and attempted to spray her with mace. Citizens, including a young child, were injured by the mace sprayed by PRESTON during the assault. PRESTON later admitted to the assault over the wiretap. For example, on April 21, 2013, PRESTON stated that "I just ran this bitch ass nigga at 7-Eleven and tried to poke him but the bitch ass nigga ran." PRESTON also reported the incident to Gladden on the morning of April 22, 2013. PRESTON advised Gladden that he wanted to kill that "nigga" and that the "fucked up thing is that I had just point the fucking joint" away….I probably would have smoked for real." PRESTON was referring to not having his gun and that if he would have had his gun, he would have killed the man. Preston further discussed details of assault as follows:

> I see him walking down Route One, you feel me? By the Econo. I'm like [U/I] I should smoke this nigga. Like, nig [PH], I'm ready to go grab the strap and smoke the nigga. You feel me? I'm like you know what? No, I'm not even gonna smoke, I'm not gonna get myself caught up behind this bitch nigga. So I go, I run into him at the Seven Eleven (7-11). He at the Seven Eleven (7-11) paying, paying for his shit. I'm behind him like, all that bitch shit you talk, what's up now? So he turn around, I mace him. *Straight mace him in the fucking face [U/I] bow, bow, bow, you feel me? His girl tried to grab me. I straight mace that bitch too. Fuck her face up, bow, bow, bow.* You feel me? So the police come. I'm like, bitch, come outside. [U/I] the police come. *I got my knife in my hand and shit. Like, come on outside you bitch nigga.* And uh, he grabs, he grabs a mop, he grabs a mop stick. I'm like, look, I'm telling you now, you got one swing and I'mma poke your bitch

4

ass. You feel me? So this nigga, he doing all this, all this trying to squash shit [U/I] as I hop in the car, he like yeah nigga, I know where you live at, I'mma smoke you. I'm like, oh yeah? [U/I] man, I think I got homie up there. So, I've been trying to get in, I've been trying to get in contact with Blood [PH] all day 'cause I want Blood to tell me if he see the nigga [U/I] I would shoot up there and do that nigga. You feel me? But, to make a long story short, this hoe ass nigga call the police. I'm sitting at, I'm sitting at the fire hydrant and shit. Nigga, I hear a knock on the door, boom, boom, boom, boom. I looked out the peep hole. Nigga, it's two (2) cops out there. It's one (1) Howard County, one (1) Laurel. Nigga, my heart dropped, yo. Like I'm not even gone lie to you, homie. My heart dropped. I'm like how the fuck did these niggas get my address. I'm like this address not even on nothing. I'm like how the fuck did they know where I at. Well nigga, look, these niggas did put, this bitch ass nigga writes down my tag number and tells the police my tag number, yo. [U/I] like yo, [U/I] really, that's what we doing? Nigga snitching now? *Like you supposed to be blood, you snitching?*

(italics added).

## DRUG TRAFFICKING and RELATED VIOLENCE

Beginning as early as 2007, PRESTON sold drugs, including crack cocaine and oxycodone, with gang members (and others) to include Johnson, Carter, and Jarrell.

On March 18, 2012, a victim contacted the HCPD about an assault involving PRESTON and Jarrell over a drug debt. The victim later testified before a federal grand jury on July 19, 2012. According to the victim, PRESTON, Jarrell, and another man came to his home to collect a drug debt. The men were driving in Jarrell's 1996 Dodge. According to the victim, he had previously purchased Oxycodone from Jarrell by contacting Jarrell on his cellular telephone. The victim stated that, approximately one month prior to the assault, he had "ripped," or stolen, $200-$300 of Oxycodone pills from Jarrell. The victim reported that on March 18, 2012, PRESTON assaulted him by punching him in the face, and that PRESTON stated that the victim should never have "played with his [PRESTON's] money," indicating PRESTON'S control and rank over Jarrell. Right after the assault, the victim tried to get away but PRESTON, Jarrell, and a third man chased after him with a baseball bat. PRESTON threatened to return later that day with his gun and "shoot up the place."

On March 31, 2013, PRESTON was intercepted over the wiretap telling Jarrell "I'm ready to go grab a mask and a strap (laughs) just get my re-up money fast," which is a reference to robbing someone for drug money or collecting money that is owed to him for drug sales with a gun. Jarrell laughed and stated "I got both." The two men go on to discuss a juvenile gang member who committed the armed robbery of a confidential informant at the direction of Johnson in November 2011, and whether he has hidden money from them. Preston states that "he gonna be running around with two hundred dollars and ima be mad as shit, ima pistol whip him."

Between February and May 2013, PRESTON was intercepted on numerous wiretap calls with co-defendants Wendy Farhat and Anthony Jones discussing narcotics sales. There are more than twenty pertinent (criminal) calls between PRESTON and Farhat between February 13, 2013 and May 8, 2013, and several more criminal calls between PRESTON and Jones. All of the calls discuss drugs (primarily if not exclusively, prescription drugs) that Farhat and Jones are supplying to PRESTON.

Farhat supplied PRESTON with at least 9000 mg of Oxycodone and Jones supplied PRESTON with at least 9000 mg of Oxycodone, the equivalent of over 120 KG of Marihuana. At times, Jones also bought Oxycodone pills from Preston for his personal use. PRESTON was surveilled meeting Farhat and Jones on separate occasions to conduct narcotics transactions. In addition, during the wiretap, agents learned that Jones illegally possessed a firearm and attempted to sell that firearm to PRESTON. PRESTON expressed interest in the firearm, but Jones had already sold the firearm to another individual.

## GUNS

In the early morning hours of May 8, 2013, law enforcement executed multiple search warrants and arrested approximately 20 individuals connected with the Bloods organization in Howard County, including PRESTON. A search warrant was executed on PRESTON's residence and evidence relating to his drug trafficking and gang association was recovered. Among the items recovered from PRESTON's residence was a .22 caliber H&R revolver, with one live round of ammunition, brass knuckles, various prescription pills, marijuana, $1,222 in U.S. currency, and various cellular telephones (including that captured during the period of the wiretap). The revolver was recovered inside a cellular phone box, inside a tote, containing documents belonging to a known gang member. Preston denies having knowledge or ownership of the gun recovered on May 8, 2013.

I have read this statement of facts and carefully reviewed it with my attorney. I acknowledge that it is true and correct.

_10-7-14_
Date

_10-7-14_
Date

_____
Anthony Preston

_____
Christopher Davis, Esq.